Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-09-00452-CV

**IN THE ESTATE OF** William **WHIPPLE**, Deceased

From the County Court At Law No. 1, Guadalupe County, Texas
Trial Court No. 2006-PC-0274
Honorable Linda Z. Jones, Judge Presiding

Opinion by:    Rebecca Simmons, Justice

Sitting:        Karen Angelini, Justice
                Phylis J. Speedlin, Justice
                Rebecca Simmons, Justice

Delivered and Filed:  December 1, 2010

AFFIRMED

In the underlying probate proceeding, a jury failed to find that William Whipple executed a will with all the formalities required to make it a lawful and valid will. John Leslie Whipple, Jr., the proponent of the will, appeals the probate court's judgment, challenging the sufficiency of the evidence and contending that the jury's answers to two of the questions submitted in the charge contained an irreconcilable conflict. We affirm the trial court's judgment.

## SUFFICIENCY OF THE EVIDENCE

### A.  Standard of Review

In his first issue, John challenges the sufficiency of the evidence to support the jury's failure to find that William executed a will with all the formalities required to make it a lawful

and valid will. "When a party attacks the legal sufficiency of an adverse finding on an issue on which [he] has the burden of proof, [he] must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). "In reviewing a 'matter of law' challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Id*. "If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law." *Id*. The legal sufficiency challenge "should be sustained only if the contrary proposition is conclusively established." *Id*. at 241–42.

"When a party attacks the factual sufficiency of an adverse finding on an issue on which [he] has the burden of proof, [he] must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Id*. at 242. "The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* "In doing so, the court of appeals must 'detail the evidence relevant to the issue' and 'state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.'" *Id*. (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

**B. Evidence Presented**

John testified that his father, John Leslie Whipple, Sr., had two brothers, William Whipple and Raymond Whipple, Jr., and one sister, Phyllis Jill Whipple. William died in November of 2004, Raymond died in October of 2006, and Phyllis died in January of 2007.

Richard Cash is one of Phyllis's children. John testified that he had a close relationship with both William and Raymond who were like older brothers to him.

After William discovered that he was terminally ill, he called John in August of 2004, and asked John to help him draft a will on John's computer. With John's help, William drafted a will naming Raymond as William's sole beneficiary and John as executor of the estate. William and Raymond lived together and had never married or had children, so John testified that William's naming Raymond as his sole beneficiary was not surprising. In the process of drafting the will, John called Nile Riedel, a lawyer whose services they had used in the past, and William read the substantive contents of the will to Riedel. John then printed out two copies of the will. William took one copy with him, and John put the other copy in a file in his desk drawer. The unsigned copy of the will John had retained was the will John sought to have admitted to probate and was introduced into evidence.

When William died in November of 2004, Raymond requested two death certificates which were sent to John. In the weeks after William died, Raymond told John that he was not in any rush to probate William's will, which could be probated anytime within two years. One reason Raymond expressed for waiting was a concern that his property taxes could go up.

In February of 2005, John met with Raymond and brought the two death certificates with him to the meeting. Raymond brought a manila folder to the meeting containing William's will. John testified that the will had been signed by William and by Billy and Bobby Smith as witnesses. Raymond put one copy of the death certificate in the folder with the will, and John kept the other copy. John testified that he never pursued probating William's will because Raymond was the sole beneficiary, and John did not believe it was his position to force him to probate.

John discovered Raymond dead in his home on a Monday in October of 2006. John had helped Raymond prepare a will similar to William's will but naming John as Raymond's sole beneficiary. John found Raymond's will in a file cabinet but did not think to look for William's still unprobated will that day. John admitted that if the unsigned copy of William's will was admitted to probate, John would inherit all of the assets of both William's and Raymond's estates. John, however, also acknowledged that if William did not have a will, Richard's mother, who was still alive at that time, would have been an heir to her brother William's estate.

John subsequently returned to Raymond's home to ensure the property was secure, and the doors were locked. Rafaye Armstrong, who was a caretaker on Raymond's property, told John that she did not have keys to the home. John returned to the property again on Wednesday or Thursday and discovered that the home was unlocked.

John testified that on the Thursday after John found Raymond dead, his cousin, Richard Cash, called and asked if Raymond had a will. John responded that he had possession of Raymond's will. When John confirmed that he did, Richard then asked if William had a will, and John confirmed that he did. Richard then asked if John had possession of William's will, and John told him that he was looking for the will. John claimed he was trying to be evasive because he did not understand the purpose for Richard's questions. Richard then informed John that he had removed boxes of documents from Raymond's property. Richard told John to give him what he wanted, or he would sue the estate. John testified that Richard stated, "I have the documents you need, and I can stretch this out for years." After calling an attorney, John went to Raymond's house and searched for William's will; however, Raymond's home was extremely cluttered. Photographs depicting the cluttered condition of Raymond's home and the buildings

on his property were introduced into evidence. John testified that he made a diligent search for the will but was unable to locate it. John testified that he believed Richard had taken the will.

Richard subsequently called John, stating he intended to take a U-Haul trailer to Raymond's property to "start loading stuff up." John and his father met Richard and allowed him to remove some family photos. After John offered Raymond's will for probate, he received a phone call from Armstrong, informing him that Richard was at Raymond's property. John went and confronted Richard, who admitted that he cut a lock to a building. John called the police, who made Richard leave the property.

On cross-examination, John stated that he spent several months searching through and reviewing all of the clutter at Raymond's property. In December of 2006, two months after Raymond's death, John's father filed an application for the administration of William's estate. John testified that an attorney advised them to file the application because Richard had filed an application. The application stated that William "may" have had a will, but its whereabouts were unknown. John stated he was unsure why the application said William "may" have had a will because he told the attorney that William did have a will, and an amended application was subsequently filed stating that William "had" a will, but its whereabouts were unknown.[1] John testified that he did not immediately file the unsigned copy of William's will for probate because his attorney had instructed him to keep looking for the signed will. John denied not filing the unsigned copy in order to come up with a plan to account for the location of the signed will. John also denied the signed will contained less favorable provisions to him than the unsigned copy he was seeking to have admitted to probate.

---

[1] John agreed that the amended application was filed on the same day as the application to probate the unsigned copy of William's will.

There was conflicting testimony at trial concerning John's delay in probating William's will and the executor named in William's will. During his deposition, John stated the reason he delayed in probating William's will was because he initially thought Raymond was named the executor. At trial, John testified that he knew he was the executor, but delayed in probating the will because Raymond asked him to wait because of tax issues. John admitted, however, that one of the subscribing witnesses, Billy Smith, also testified in his deposition that Raymond was named as executor in William's will. When asked on cross-examination about the location of the copy of William's will that named Raymond as executor, John responded there was no will in which Raymond was named as executor.

Nile Riedel had consulted with William about his need for a will and was subsequently consulted over the phone when John was assisting William in drafting a will. Riedel could not testify whether he had or had not seen William's will.

Subscribing witnesses Bobby Wayne Smith and his brother Billy Smith helped William and Raymond with remodeling projects, and they were friends. The Smiths agreed to be witnesses to William's will. In August of 2004, Raymond and William went to the Smiths' house. Raymond had the will in a folder. William thumbed through the will and signed it first. Raymond told Bobby and Billy that they needed to read the will. Bobby testified that he read the will before he signed it as a witness, and then handed it to Billy to sign. Bobby recognized the signature page of the unsigned copy of William's will because he signed that page and put his driver's license number under his signature on the original signed copy.

On cross-examination, Bobby admitted that he met with John, John's attorney, and Billy before his deposition was taken. Bobby testified that he recognized the signature page of the will

but did not remember the rest of it. Thus, he could not be certain if the unsigned copy of the will was the same as the will he signed.

Bobby's credibility was questioned based on Bobby's close dealings with John. There was testimony that in 1998 or 1999, a potential buyer approached Bobby and offered to purchase his parent's home from him for $22,000. Although Bobby signed a paper to effectuate the sale, John helped Bobby get out of the deal when Bobby later decided he did not want to sell the house to the potential buyer. Bobby subsequently sold the house to John for $30,000.

Billy Smith testified that William and Raymond went to the Smiths' house to sign William's will in August of 2004. Billy testified that William signed the will first, then Bobby, then himself. After signing the will, they put their driver's license numbers under their signatures.

On cross-examination, Billy admitted that he met with John, John's attorney, and Bobby before his deposition was taken. Billy admitted that he initially testified in his deposition that he had never seen a will. At trial, Billy testified that he changed his deposition response because he meant that he had never seen a will before William's will. Billy also admitted that he initially testified in his deposition that he remembered reading in the will that Raymond was named as executor. At trial, Billy testified that he changed his deposition response because he only assumed Raymond was the executor. Billy further admitted at his deposition that he would not be able to identify the document that he witnessed unless his signature was on it. At trial, Billy testified that he vaguely remembered the signature page of the unsigned copy of William's will as something he had seen. Billy admitted that he never testified in his deposition that he wrote his driver's license under his signature. At trial, Billy testified that he and Bobby independently recalled writing their driver's license numbers under their signatures while they were reviewing

their deposition transcripts in preparation for trial. Billy admitted that he had spoken with John about the deposition on and off since the deposition was taken in September of 2008.

James Udkler interacted with William approximately two or three times, but Udkler and Raymond were very good friends. Udkler testified that he was at Raymond's property working on a backhoe with another person and overheard Richard requesting that Raymond pay him $3,000.00 per month. Raymond looked shocked and walked Richard away from Udkler and the other person. Udkler recalled the other person remarking they were only getting paid $10.00 an hour. Udkler also recalled Raymond receiving a cell phone call from Richard one evening while Raymond was at Udkler's house. Udkler recalled that Raymond became upset and lost all color in his face. Udkler testified that he recognized Richard's voice as the caller and overheard Richard cursing at Raymond. Udkler testified that he and Raymond were making plans to go to Mexico after Christmas in 2006. One day, Udkler stopped by Raymond's house and asked if he was preparing for the trip. Raymond went inside and returned with a folder containing some papers. Raymond told Udkler that he had to take care of the papers before he went to Mexico. Udkler testified that he read the documents in the folder which consisted of William's will and a death certificate. The will had the signatures of William, Bobby, and Billy. Udkler recalled that Raymond returned to his home with the folder as Udkler was leaving. Udkler testified that the unsigned copy of the will was the same as the signed will he saw that day. On cross-examination, Udkler testified that he mentioned seeing William's will when he met with John and his attorney to discuss going to court in regard to Raymond's will because Udkler was a subscribing witness on that will.

Richard testified that he was in the United States Air Force from 1993 to January of 2006. Raymond died approximately ten months after Richard returned to San Antonio. Richard

testified that he did not know whether William had a will or not. Between January of 2006 and October of 2006 when Raymond died, Richard visited Raymond on three or four occasions. On one occasion, Raymond took Richard into various buildings on the property looking for property belonging to Richard's mother, Phyllis. Richard testified that he saw an antique telephone chair and a bench stool that belonged to his mother.

After Raymond died, Richard showed up at an investment office with a copy of William's death certificate. Richard stated that he obtained the death certificate from his mother after they discussed the need to probate William's estate. Richard stated that he believed his mother would inherit from William; however, Richard admitted that his mother would not have inherited anything from William if the unsigned copy of the will was William's actual will. Richard applied to be the representative of William's estate in November of 2006 because his mother asked him to take care of it. His mother was concerned that her personal property located on Raymond's property would be in jeopardy. When Richard asked John about the property belonging to Richard's mother, John told him it was property of Raymond's estate.

Richard denied taking William's will from Raymond's property or threatening John about Raymond's estate. He testified that he went to Raymond's property three times after Raymond's death. On the first occasion, he and his sister removed a box of photographs that included wedding photographs of Richard's mother and father. The second time, Richard did not remove anything. The third time, Richard took a 13-page handwritten letter his mother had written, and a letter she received from a school board. Richard stated that he believed he could go to the property because he was an heir to the property and was looking for his mother's belongings. Richard admitted cutting a lock to one of the buildings, but testified that John had stated he had no keys to the building and told Richard he was free to try to gain access.

Armstrong and her husband were the caretakers for Raymond's property. Armstrong testified that Richard and his sister came to the property after Raymond died, stating that they were going to look through their mother's things. Armstrong pointed out a horse trailer where their mother's things were stored. Armstrong saw Richard and his sister leaving with a painting and a box that contained papers and a photo album. Armstrong stated that they began having trouble with the front door to Raymond's home not locking properly after Richard and his sister had visited the property.

## C. Analysis and Conclusion

John contends the evidence conclusively established that William executed a duplicate copy of the unsigned will that was being offered for probate. The jury question at issue asked the following:

Question No. 1

Do you find from a preponderance of the evidence that William Whipple executed a will with all of the formalities required to make it a lawful and valid will?

Answer "Yes" or "No"

WE THE JURY ANSWER:   No

INSTRUCTION:

You are instructed that all of the formalities required by law to make a valid Will are as follows:

1. The Will must be in writing,
2. The testator must be 18 years of age or older,
3. The testator must personally sign the Will; and
4. The Will must be attested by two or more credible witnesses above the age of 14 years who each subscribe their name to the Will in their own handwriting in the presence of the testator. There is no requirement that the witnesses sign in each other's presence.

TEX. PROB. CODE ANN. § 59 (West 2003) (listing same requisites of will as set forth in jury question).[2]

In reviewing John's contention that the evidence is legally and factually insufficient to support the jury's failure to find that a will was executed with all formalities, we must be cognizant of our role as a reviewing court. "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). "They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *Id.*

The jury in the instant case was presented with a copy of an unsigned will. Although the jury was presented with testimony that William and two witnesses had signed the will, the evidence presented numerous credibility challenges that the jury was required to resolve.

The first document filed by John's father in connection with William's estate was an application stating that William "may" have had a will. The application was subsequently amended to state William "had" a will at the same time the unsigned copy of the will was offered for probate. John testified that he would inherit all of the assets of both estates if the unsigned copy of the will was admitted to probate. From the evidence presented, the jury was required to weigh the credibility of the testimony regarding the conflict in the applications, and the delay in offering the unsigned copy of the will for probate.

The unsigned copy of the will named John as executor. In his deposition, John initially testified that Raymond was named the executor of William's will and gave this as his reason for not proceeding with the probate of William's will. Billy similarly testified that Raymond was

---

[2] The jury also was asked whether the executed will could not be produced in court because it was taken or lost and could not by reasonable diligence be produced. The jury answered "no." *See* TEX. PROB. CODE ANN. § 85 (West Supp. 2010) (providing if a written will cannot be produced in court, the proponent must prove the cause of its non-production, reasonable diligence was used to produce the will, and the will's contents). Finally, the jury was asked whether the unsigned copy of the will offered for probate by John was William's will. The jury answered "no."

named as the executor of the will. Although the testimony of both witnesses changed at trial, the jury was required to evaluate the credibility of the witnesses and determine whether a signed will had existed in which William named Raymond as executor.

Both Billy and Bobby testified that they remembered the signature page of the unsigned copy of the will but not the remaining contents of the document. During their depositions, neither Billy nor Bobby testified that they had written their driver's license numbers under their signatures. At trial, they both recalled writing their driver's licenses numbers under their signatures as a reason for recalling the signature page. Billy denied that he had discussed this issue with Bobby before trial but testified that both Billy and Bobby had independently recalled writing their driver's license numbers while reviewing their depositions. Billy also testified at his deposition that he had never seen a will, but amended his answer to state that he had never seen a will other than William's will. The jury was required to evaluate Billy's and Bobby's credibility in order to determine whether William's will was properly witnessed.

The jury was also required to evaluate the context in which Udkler testified that he saw William's executed will. Udkler testified that Raymond showed him the will as an item he needed to resolve before going on a trip to Mexico. Udkler testified that he informed John and his attorney about seeing William's executed will during a meeting in preparation for his going to court as a witness to Raymond's will. Udkler initially testified that he mentioned seeing William's executed will in response to a question by John's attorney, but later testified that he spontaneously informed John and his attorney about seeing William's will. The jury also had to evaluate the credibility of Udkler's testimony by considering his uncorroborated testimony regarding Richard making monetary demands on Raymond and cursing him, which appeared to be an effort by Udkler to portray Richard in a negative light.

Having reviewed the testimony as a whole and deferring to the jury's right to assess the credibility of the witnesses' testimony and to accept or reject any witness's testimony, we conclude the evidence was legally and factually sufficient to support the jury's finding. After evaluating the witnesses' credibility and deciding which witnesses to believe, the jury could have determined that the unsigned copy of the will presented for probate had not been signed by William or was not attested to by two credible witnesses who subscribed their name to the will.

## CONFLICTING JURY ANSWERS

In his second issue, John contends that the jury's answers to two questions were conflicting. In his brief, Richard asserted that John did not preserve this complaint for appellate review because he did not raise any contention concerning conflicting jury findings before the jury was discharged. *See Beard v. Comm'n for Lawyer Discipline*, 279 S.W.3d 895, 904 (Tex. App.—Dallas 2009, pet. denied); *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 162 (Tex. App.— San Antonio 2008, pet. denied). We agree with Richard. After the trial court read the jury's verdict, the trial court asked if anybody was "requesting anything else at this time." John's attorney responded, "No, your honor." Because no objection was made with regard to conflicting jury answers before the jury was discharged, we overrule John's second issue. *See Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 866–67 (Tex. App.— Austin 2006, pet. granted, judgm't vacated w.r.m.) (holding complaint that jury's answers fatally conflicted was waived absent timely objection before jury was discharged).

## CONCLUSION

The trial court's judgment is affirmed.

Rebecca Simmons, Justice